# CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Heather Williamson, being duly sworn, depose and state that:

## INTRODUCTION

1.      I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—cellular telephones, as described in Attachment A - that are currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2.      I am a Special Agent of the Drug Enforcement Administration ("DEA") and have been so employed since January 2013. I am currently assigned to the Grand Rapids District Office. Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and FBI, and composed of several other federal, state, and local agencies that are focused on the disruption of the Mexico-based Sinaloa Cartel. Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials. I have investigated drug trafficking organizations in relation to violations of federal laws such as unlawful importation of controlled substances, the distribution of controlled substances, manufacturing controlled substances, and

possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, and other dangerous drugs, as well as money laundering.

3. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering, conspiracy to do the same, and attempts to do the same, in violation of 18 U.S.C. §§ 1956 and 1957.

4. I respectfully submit that there is probable cause to believe that TREVON RAY has engaged in the distribution of, and in the possession with intent to distribute, crystal methamphetamine and heroin, and that he has conspired to do the same, in violation of 21 U.S.C §§ 841(a)(1), 846. I further submit that there is probable cause to believe that evidence of this offense will be found on the cell phones described in Attachment A.

5. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. This continuation supports the application of the warrants to search the property — two cellular telephones – currently in the possession of law enforcement, hereinafter collectively referred to as "the DEVICES":

| Device | Model | MSISDN | IMEI |
|---|---|---|---|
| 1 | Black iPhone with damaged screen | Unknown | Unknown |
| 2. | Black iPhone with damaged screen and case | Unknown | Unknown |

7. The DEVICES are currently located at the West Michigan Enforcement Team Office in Norton Shores, Michigan. The applied-for warrant would authorize the forensic examination of the DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8. Since October 2019, agents and officers from the DEA Grand Rapids District Office ("GRDO"), Michigan State Police ("MSP"), and West Michigan Enforcement Team ("WEMET") have been conducting a joint investigation into a drug trafficking organization that includes TREVON RAY. The investigation revealed that TREVON RAY and others known and unknown distribute quantities of crack cocaine, heroin and fentanyl throughout the greater Muskegon area,

frequently accompanied by the use of firearms and other acts of violence.

9. TREVON RAY's criminal history includes convictions for felony carrying concealed weapons, possession of marijuana, possession of controlled substance less than 25 grams, multiple felony assault/resisting/obstructing a police officer causing injury, and possession of weapons in jail.

10. Investigators have had multiple contacts with TREVON RAY that have resulted in the seizure of narcotics, including traffic stops on January 10, 2019, October 1, 2019, and January 11, 2020 where investigators seized fentanyl, heroin, cocaine, a digital scale, and bulk cash.

April 1, 2020 Muskegon PD Respond to a Home Invasion/Non-Aggravated Assault

11. On April 1, 2020, Muskegon Police were dispatched to 877 Emerson Avenue in the City of Muskegon for a domestic assault. Upon arrival to the scene, officers spoke with Shatyra Randle who stated that she had been assaulted by her child's father, TREVON RAY. An arrest warrant was subsequently issued by a Muskegon court for First Degree Home Invasion.

April 14, 2020 Surveillance and Pursuit of TREVON RAY

12. On April 14, 2020, MSP observed TREVON RAY driving a 2019 Ford Fusion bearing Michigan license EBN9263.[1] Specifically, MSP observed TREVON RAY travelling eastbound on Apple Avenue from Maple Street in the City of

---

[1] 2019 Ford Fusion bearing Michigan license EBN9263 is an AVIS rental vehicle determined to be rented by Gloria Hill, 1807 W. River Road, Muskegon, Michigan 49442.

Muskegon. Law enforcement maintained surveillance on the vehicle to 1074 Ada Avenue in the City of Muskegon. Investigators observed TREVON RAY walk into the residence. Several minutes later, investigators observed a male subject matching TREVON RAY's description exit the residence wearing a fabric face mask and return to the driver's side of the vehicle. Investigators confirmed the same license plate that had been previously observed by MSP and maintained surveillance on the vehicle until WEMET detectives were able to confirm that the vehicle was being driven by TREVON RAY. MSP initiated a traffic stop on the vehicle, at which time TREVON RAY disregarded the emergency lights and sirens and fled from the marked unit. MSP terminated the pursuit, however Muskegon Heights Police began pursuing TREVON RAY for several minutes before ultimately terminating its pursuit. The vehicle was ultimately located near Oakwood Avenue and 6th Street in the City of Muskegon. The vehicle was unoccupied and stopped in the middle of the road. Investigators conducted a three block perimeter search, including an MSP canine partner, but were unable to locate TREVON RAY.

13. A search of the Ford Fusion resulted in the seizure of two cellphones (not the devices sought to be searched in this application), a black Digiweigh digital scale with suspected drug residue and a corner tie plastic sandwich baggie containing 1.15 grams of heroin.[2] Also located in the glove box was a J&J bail bonds receipts for TREVON RAY. Investigators also located a Discount Tire receipt in the

---

[2] The suspected heroin was tested with the Trunarc and tested positive for the presence of heroin.

trunk of the vehicle with the name "Tre Ray" on it, which I know to be a shortened name for TREVON RAY.

### May 13, 2020 Surveillance, Pursuit and Arrest of TREVON RAY

14. On May 13, 2020, WEMET Detectives located TREVON RAY in furtherance of the outstanding felony warrants associated to him. Investigators located a blue Chevrolet Silverado,[3] a vehicle that was possibly being driven by TREVON RAY, at the Quail Meadows apartment complex in Muskegon. Investigators initiated surveillance on the vehicle and observed it travel to the Sunny Mart store on 2021 Marquette Avenue, at which time investigators were able to positively identify the driver as TREVON RAY. Investigators requested the assistance of marked units from the Muskegon County Sheriff's Office. Deputies attempted to traffic stop the vehicle in the area of Marquette and Creston in the City of Muskegon. TREVON RAY fled from the traffic stop and led law enforcement on a lengthy vehicle pursuit that spanned Muskegon City, Muskegon Township and Muskegon Heights. The pursuit ended when the vehicle crashed into a detached garage behind 2917 7th Street in Muskegon Heights, Michigan. TREVON RAY was subsequently taken into custody by responding officers.

15. A search of the vehicle revealed a black digital scale on the ground next to the driver's side door on the ground, approximately $1101 U.S. Currency in the left shoe of a pair of white shoes located next to the vehicle, a plastic corner tied bag

---

[3] 2020 Chevrolet Silverado bearing Michigan license DC83537 is an Enterprise rental vehicle determined to be rented by Marlon Sutton, 3808 White Street, Grandville, Michigan, with an associated phone number of 231-206-0448.

with suspected cocaine on the dash of the vehicle and a box of baking soda on the passenger side floor of the vehicle. Based on my training and experience, I know that baking soda is often used as a cutting agent to mix with cocaine. Investigators also located a corner tie bag containing suspected heroin/fentanyl located between the driver's seat and the center console of the vehicle. Trooper Van't Hof located DEVICE 1 on the driver's side floorboard of the vehicle. Trooper Van't Hof further located DEVICE 2 on the ground near the driver's side door of the vehicle.

16. The suspected heroin weighed 21 grams and tested with the Trunarc and tested positive for the presence of heroin/fentanyl compound. The suspected cocaine weighed approximately 26 grams and tested with the Trunarc and tested positive for cocaine HCL.

17. DEVICE 1 and DEVICE 2 were seized by law enforcement and maintained in a cell phone evidence locker in the offices of the West Michigan Enforcement Team in Norton Shores, Michigan. Based on my training and experience, it is common for drug traffickers to utilize more than one cell phone device in order to avoid detection by law enforcement and separate customers and sources of supply. I also know based on law enforcement's prior contacts with TREVON RAY, that multiple cellphones and drugs are frequently located together in vehicles driven by TREVON RAY.

18. I know from training and experience that, to protect against theft, drug traffickers frequently keep firearms and ammunition on or about premises where they store drugs, currency, or other items of value. Because drug traffickers cannot

report the theft of drugs, drug proceeds, or other items of value to law enforcement without substantial risk of their illicit activities being discovered, they themselves must "police" areas where drugs are bought, sold, and stored through the possession and use of firearms and other dangerous weapons.

19. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

    a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

    b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

    c. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

    d. That drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business and often store information related to the profits of their narcotics trafficking on their devices;

    e. Global Position System (GPS) data on phones may show the

   location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

f. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

g. Drug traffickers often use the Internet to look up various information to support their drug trafficking activities on their devices;

h. That drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns.  Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from.  Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the

    aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

 i. That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds on their devices. This evidence includes information related to currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers; and

 j. That drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service and frequently keep copies of tracking numbers, receipts and photographs of packaged narcotics on their devices.

## TECHNICAL TERMS

20. Based on my training and experience, I use the following technical terms to convey the following meanings:

 A. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and

data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

B.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable

storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

C. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

D. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the

Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

E. PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global

     positioning system ("GPS") technology for determining the location of the device.

  F. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  G. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

 21. Based on my training, experience, and research, and from consulting the manufacturers' advertisements and product technical specifications available online, I know that devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my

training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   A. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICES consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICES to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine the DEVICES already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the DEVICES described in Attachment A to seek the items described in Attachment B.